## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **JOANN STAFFORD** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 3:05-0346** |
| **v.** | ) | **Judge Wiseman / Knowles** |
| | ) | |
| **JO ANNE BARNHART,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security which found that Plaintiff was not disabled and which denied Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket Entry No. 7. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 11. Plaintiff has filed a Reply. Docket Entry No. 12.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I. INTRODUCTION

Plaintiff filed her application for Disability Insurance Benefits on November 9, 2001,

1

alleging that she had been disabled since July 1, 2001, due to bilateral carpal tunnel syndrome status post releases, shortness of breath, and disorders of the lumbar spine. *See, e.g.,* Docket Entry No. 4 ("TR"), pp. 13-14. Plaintiff's application was denied both initially (TR 26-28) and upon reconsideration (TR 29-30). Plaintiff subsequently requested (TR 38) and received (TR 20-24) a hearing. Plaintiff's hearing was conducted on May 17, 2004, by Administrative Law Judge ("ALJ") Robert C. Haynes. TR 258. Plaintiff and Vocational Expert, Kenneth Anchor, Ph.D, appeared and testified. TR 258-293.

On October 18, 2004, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 10, 13-19. Specifically, the ALJ made the following findings of fact:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

2

7. The claimant has the following residual functional capacity: medium work. The claimant is able to lift 50 pounds occasionally and 25 pounds frequently. She can stand/walk for six houts [*sic*], and sit for six houts [*sic*] in an eight hour workday. She is unable to use the hands for repetitive gripping, grasping, or wrist movements. The claimatn [*sic*] is limited in her abiity [*sic*] to hear. She should avoid concnetrated [*sic*] exposure to noise, vibratiion [*sic*], gumes [*sic*], odors, dusts, gases, and poor ventilation.

8. The claimant's past relevant work as a garment inspector did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

9. The claimant's medically determinable bilateral carpal tunnel syndrome status post releases do not prevent the claimant from performing her past relevant work.

10. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(e)).

TR 18-19.

On December 28, 2004, Plaintiff filed a request for review of the hearing decision. TR 9. On April 2, 2005, the Appeals Council issued a letter declining to review the case (TR 5-7), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff alleges disability due to bilateral carpal tunnel syndrome status post releases,

Case 3:05-cv-00346   Document 13   Filed 09/07/06   Page 3 of 40 PageID #: 344

shortness of breath, and disorders of the lumbar spine. TR 14.

On February 16, 1989, Dr. Alfred Todd reported that an x-ray of Plaintiff's left shoulder showed a normally articulated humeral head with a Glenoid fossa, no fracture, no dislocation, and no soft tissue calcifications.[1] TR 111.

On October 30, 1989, Plaintiff saw Dr. Floyd Reed, Jr., for pain in her left arm. TR 230. Dr. Reed noted that Plaintiff was taking muscle relaxers occasionally. *Id.* He further noted A-C separation. *Id.*

On November 1, 1989, Plaintiff returned to Dr. Reed, complaining that her shoulder was hurting. TR 230. Dr. Reed diagnosed cervical sprain and noted that Plaintiff was off work until November 20, 1989. *Id.*

On January 22, 1990, Dr. Reed reported that Plaintiff complained of shoulder pain, that she "couldn't go to work," and that she wanted "a statement." TR 230. Dr. Reed repeated his diagnosis that her left shoulder was sprained. *Id.*

On January 10, 1991, Plaintiff returned to Dr. Reed with pain and swelling in her left shoulder, and he prescribed medications.[2] TR 229.

On April 11, 1994, Plaintiff visited Dr. Reed for wheezing and coughing, and was diagnosed with asthmatic bronchitis. TR 229.

On February 9, 1996, Plaintiff visited Dr. Reed for head congestion. TR 228. Dr. Reed noted Plaintiff's complaint that her left foot had been "hurting for past 3 weeks," but she denied

---

[1] The record does not indicate where the x-ray was taken or the reason for Plaintiff's visit. TR 111. Dr. Reed's report of October 30, 1989, however, suggests that Plaintiff had hurt her left arm and had visited an emergency room in February. TR 230.

[2] The names of the medications prescribed are illegible. TR 229.

4

having injured it.  *Id.*  Dr. Reed diagnosed sinusitis, as well as tendinitis in the left foot and both wrists, and he prescribed medications.[3]  *Id.*

On February 16, 1996, Plaintiff returned to Dr. Reed with the flu, pain in her left foot, and pain in both elbows when she worked.  TR 228.  Dr. Reed again diagnosed bilateral tendinitis and prescribed medications.[4]  *Id.*

On May 9, 1996, Plaintiff went to Dr. Reed, complaining that her arms and legs were swollen and hurting.  TR 227.  Dr. Reed noted Plaintiff's report that she had become weak and nauseated at work that morning.  *Id.*  A laboratory report from SmithKline Beecham Clinical Laboratories, also dated May 9, 1996, indicated that Plaintiff's test results were all within normal range except for slightly low glucose, MPV, and absolute eosinophils; and slightly high absolute neutrophils.  TR 231-232.

On August 2, 1996, Plaintiff visited Dr. Reed, complaining of a dry cough and head congestion that had started four days earlier and that had become worse at night.  TR 227.  She also complained that her arms were "still bothering her."  *Id.*  Dr. Reed's diagnosis was "allergies"; he prescribed new medications and refilled the previous medications for her arms.[5]  *Id.*

On August 13, 1996, Plaintiff visited Dr. Reed, complaining of back pain that had begun the day before when she was moving furniture.  TR 226.  Plaintiff reported that the pain had started in the middle of her back, but had become stronger on the right side.  *Id.*  Dr. Reed's

---

[3] The names of the medications prescribed are illegible.  TR 228.

[4] The names of the medications prescribed are illegible.  TR 228.

[5] The names of the medications prescribed are illegible.  TR 227.

5

assessment was an acute sprain.[6]  *Id.*

Plaintiff went to Dr. Reed on February 13, 1997, complaining of weak spells that made her start shaking "inside and out," numbness in both hands, forearm pain, and edema in the hands.  TR 224.  Dr. Reed diagnosed carpal tunnel syndrome, anxiety disorder, and possible hypoglycema.  On Dr. Reed's orders, Plaintiff had blood drawn on February 13, 1997, at the Trousdale Medical Center.  TR 198.  The laboratory report indicated that Plaintiff's test results were out of range for MCHC, AST, ALB, and A/G.  *Id.*

Dr. Reed referred Plaintiff to Dr. Jeffrey Hazlewood, who evaluated her wrist pain on March 4, 1997.  TR 112-117.  Dr. Hazlewood reported that Plaintiff had carpal tunnel syndrome that was "fairly significant in degree with thenar eminence denervation bilaterally" but worse on the right.  TR 112.  He noted Plaintiff's report that she had been suffering bilateral forearm and wrist pain for the past two to three months; that she rated the pain as a six out of ten; that the pain was sharp, intermittent, and aching; that she had some right hand weakness at times and sometimes dropped objects; and that she had been successfully treating elbow pain and swelling with Relafin for the past year, although the pain did not spread all the way to the shoulders or neck.  TR 113.  Dr. Hazlewood recommended wrist splints, continuing Relafin, and referral to an orthopaedic surgeon for possible carpal tunnel release.  TR 114.

Dr. Reed noted that he called Dr. Paul Abbey on March 5, 1997.  TR 224.

On March 12, 1997, upon the referrals of Dr. Reed and Dr. Hazlewood, Plaintiff went to Dr. Paul Abbey, a hand and micro-surgeon.  TR 168-170.  Dr. Abbey noted that Plaintiff was right handed and that she had no significant medical history.  TR 168.  He reported that

---

[6] Another assessment, as well as further handwritten notes, are illegible.

6

Plaintiff's main complaint was numbness, tingling, and some pain, mostly on the right, which woke her at night and bothered her during the day, affecting her daily activities and worsening over the past few months. *Id.* He noted that Dr. Hazlewood's EMG/nerve conduction study test showed "fairly severe" carpal tunnel syndrome on the right, without evidence of radiculopathy or peripheral neuropathy. *Id.* Dr. Abbey recommended that Plaintiff wear splints regularly for three to four weeks, and noted that her job might need to be modified if it became difficult for her to work wearing the splint. TR 168-169. Dr. Abbey also noted that he did not expect non-operative measures to be effective because of the magnitude of her carpal tunnel syndrome, but that he would "do everything possible" to improve her condition without surgery. TR 170.

Dr. Abbey next saw Plaintiff on March 26, 1997, and reported improvement, although she still had "some discomfort" in her right wrist. TR 167. The doctor noted his belief that she would not improve as long as her job included repetitive motions. *Id.*

On April 9, 1997, Plaintiff returned to Dr. Abbey, who reported that she was "better" after being kept off work, but that she was still suffering "pain and discomfort, burning, knotting up," and tingles in her wrist that were "getting better" and "not happening nearly as often." TR 166. Dr. Abbey recommended continuing the same restrictions. *Id.*

On April 23, 1997, Dr. Abbey reported that Plaintiff "has noted some fairly good improvements" and that the discomfort or pain in her wrist had replaced the tingles as her main problem. TR 165. Dr. Abbey stated that Plaintiff could return to work if her job could be modified; otherwise, he would issue her permanent restrictions. *Id.* He also noted that it was "really quite hard" for Plaintiff to communicate her pain, "so it's hard to know for sure exactly what all these feelings and sensations are." *Id.*

7

Plaintiff went to Dr. Michael E. Glasscock of The Otology Group, on April 28, 1997, with complaints of a gradual decrease in hearing bilaterally, which Dr. Glasscock found to be associated with bilateral roaring tinnitus and aural fullness.  TR 174-178.  Dr. Glasscock diagnosed bilateral otosclerosis, and recommended the options of "watchful waiting, hearing aid, or stapedectomy."  *Id.*

On May 14, 1997, Dr. Abbey reported that Plaintiff was "getting somewhat worse" in that she still had paresthesias and was experiencing discomfort in her palm and fingers.  TR 164.  Dr. Abbey noted that Plaintiff was not working, and he recommended that she not work until she had surgery.  *Id.*

According to a letter from Dr. C. Gary Jackson, dated August 6, 2001, Plaintiff was seen on May 16, 1997, by Dr. John Tate of The Otology Group, who processed an order for a hearing aid evaluation for both ears.  TR 173.

Plaintiff had a chest image taken at the University Medical Center on May 28, 1997, by Dr. Ginny Charnock.  TR 123.  Dr. Charnock's impression was "no acute pulmonary abnormality."  *Id.*

On May 30, 1997, Dr. Abbey performed a right mini open carpal tunnel release on Plaintiff.  TR 121.  He reported that Plaintiff had not improved with the nonsurgical measures that had been taken to treat her carpal tunnel syndrome, and that it was affecting her daily activities.  *Id.*  Dr. Abbey noted that Plaintiff was in satisfactory condition after the operation.  TR 122.

Dr. Abbey reported on June 4, 1997, that Plaintiff was "doing nicely" and that her tingles had "dramatically improved;" he prescribed a splint and exercises.  TR 162.  On June 10, Dr.

8

Abbey again reported that Plaintiff's carpal tunnel symptoms were improved, although she did have "some abnormal sensation going up her arm." TR 161. On June 14, Dr. Abbey noted that Plaintiff was "doing well" and was "not uncomfortable." TR 160.

Dr. Abbey performed a left mini open carpal tunnel release on Plaintiff on July 2, 1997. TR 119. He reported that she had "done nicely" with the right carpal tunnel release and had wanted to proceed with the left. *Id.* Plaintiff was in satisfactory condition after the procedure. TR 120. On July 9, 1997, Dr. Abbey reported that Plaintiff was "doing nicely," that he had put her in a removable splint, and that he had given her some exercises to do. TR 159. On July 16, 1997, he reported that Plaintiff was "doing well," that her tingles had improved, and that he anticipated her going back to work. TR 158.

On August 15, 1997, Plaintiff saw Dr. Reed for a check-up and to get her Relafen refilled. TR 224. Dr. Reed reported that she denied experiencing other problems. *Id.*

On August 18, 1997, Dr. Abbey noted that, although Plaintiff had not yet returned to work, he believed that she was ready to return and that she could work her way up from four to eight hours a day over the next three to four weeks. TR 157. After discussing Plaintiff's condition with her employer, Dr. Abbey reported that there seemed to be no way to modify the repetitive nature of her work, but he still believed that her employer would "make it as easy for her as possible" if she worked less than a full day. *Id.*

Dr. Abbey saw Plaintiff again on September 17, 1997, for a follow-up examination. TR 156. He reported that she was "doing very well," that she had gotten back up to production at work, and that she was working ten hours per day, four days per week. *Id.* He added that her tingles were entirely gone, but that she was experiencing "some slight discomfort." *Id.* He

9

reported his belief that she had reached maximum medical improvement. *Id.*

Plaintiff returned to Dr. Abbey on November 17, 1997, complaining of lack of grip strength. TR 155. Dr. Abbey reported that her grip strength had improved from previous measurements, although the right was not as strong as the left. *Id.* He also noted his belief that she could return to her regular duty. *Id.*

On November 19, 1997, Plaintiff asked Dr. Reed for antibiotics to treat a tooth abscess until she was able to go to a dentist. TR 223. He gave her a prescription.[7] *Id.*

On January 12, 1998, Dr. Abbey reported that Plaintiff was "doing well." TR 154. He noted that although she had "some intermittent pain" on the right side, she had no tingles, a full range of motion, two point discrimination less than five millimeters in all fingers, well-healed incisions, and improved grip strength. *Id.* He noted that her left side was "doing very well." *Id.* Dr. Abbey again recorded his belief that she had reached maximum medical improvement. *Id.*

Plaintiff went to Dr. Reed on February 17, 1998, with complaints of coughing, chest pain, and "stopped up" head and ears. TR 223. Dr. Reed diagnosed bronchitis and tinnitis.[8] *Id.*

On March 27, 1998, Plaintiff visited Dr. Reed, complaining that her left foot had been hurting for the past few weeks, though she did not remember injuring it.[9] TR 222.

On June 23, 1998, Plaintiff visited Dr. Abbey with a complaint of increased wrist pain after changing to a job that her supervisor thought would be better for her, which involved reaching up, grabbing parts, and stacking them. TR 153. Dr. Abbey diagnosed tendinitis. *Id.*

_____

[7] The name of the medication is illegible. TR 223.

[8] Further handwritten notes are illegible. TR 223.

[9] Dr. Reed's assessment and plan are illegible. TR 222.

10

Dr. Abbey noted that he had spoken to her supervisor, suggesting that she go back to her old job, but that the supervisor was uncooperative, suggesting "that he had a better sense of what was going on than [the doctor] did." *Id.* Dr. Abbey suggested a splint and anti-inflammatory medication. *Id.*

On September 15, 1998, Dr. Abbey reported that Plaintiff was "generally doing OK" and that there was "no real significant change" other than slight aching, stiffness, and discomfort. TR 152. Dr. Abbey reported that Plaintiff's grip strength measurements were "satisfactory" and that her tingling was "better." *Id.* He continued the splints and anti-inflammatories. *Id.*

Plaintiff went to Dr. Reed on October 1, 1998, complaining that her left foot had started hurting again.[10] TR 221.

On November 16, 1998, Dr. Abbey reported that Plaintiff's carpal tunnel syndrome was "doing well"; she was not experiencing tingles or paresthesias, and her grip strength remained unchanged from two months prior. TR 150. He noted that she was in discomfort on the right side, and tests revealed mild lateral epicondylitis, but no discreet tendinitis. *Id.* Dr. Abbey noted that she was able to work and was "comfortable." *Id.* He prescribed a tennis elbow splint and anti-inflammatories. *Id.*

On December 16, 1998, Dr. Abbey reported that Plaintiff continued to experience pain on her bad days and appeared to have paresthesias in her fingers. TR 149. He noted that Plaintiff's pain was probably caused by the tendinitis, but that it did not interfere with her daily activities and that it only occurred once or twice a week. *Id.* He reported that she was "generally doing well" and had reached maximum medical improvement. *Id.*

---

[10] Dr. Reed's assessment and plan are illegible. TR 221.

On February 23, 1999, Dr. Reed reported that Plaintiff had gone to the emergency room the night before with pain in her right ear, and that the attending physician had told her that she had fluid behind her ear. TR 221. He noted that she also complained of occasional pain on her left side and of occasional nausea. *Id.* Dr. Reed prescribed medications.[11] *Id.*

On March 9, 1999, Plaintiff returned to Dr. Reed with the flu, and he noted that the fluid in her ear had gotten better. TR 220.

On March 30, 1999, Plaintiff returned to Dr. Abbey complaining of pain consistent with wrist tendinitis, and Dr. Abbey noted his belief that the pain was related to her work. TR 148. He again suggested splints and anti-inflammatory medications. *Id.*

On April 27, 1999, Dr. Abbey saw Plaintiff and noted that her condition was "essentially the same," although Lodine XL was helping. TR 147. He noted that her discomfort was "diffuse," but worse after she did "a certain amount of work." *Id.*

On July 27, 1999, Dr. Abbey noted that Plaintiff was "generally about the same as she has always been." TR 146. He reported that she was working, but still suffered from diffuse hand pain, which had improved after she went on a ten day vacation. *Id.* Dr. Abbey noted that Plaintiff was able to do most of her daily activities, that her neck, shoulders, elbows, wrists, and fingers had full range of motion, and there were neither extrinsic nor intrinsic sites of tendinitis detected. *Id.* He reported her grip strength without comment. *Id.* Dr. Abbey opined that Plaintiff had "no further impairment" and had reached maximum medical improvement. *Id.*

Plaintiff next saw Dr. Abbey on March 30, 2000, with pain between her fingers, at the base of her thumb, and over her wrist. TR 145. An x-ray of Plaintiff's thumb and wrist revealed

---

[11] The names of the medications are illegible. TR 221.

no defined degenerative changes, abnormal angles, or evidence of Keinbock's disease. *Id.* Dr. Abbey reported his belief that he "could improve things but not necessarily 100%." *Id.* He diagnosed de Quervain's tendinitis in the thumb and prescribed a protective splint, in which she could continue to work, and anti-inflammatory medicines. *Id.* Plaintiff obtained the splint at the University Medical Center the same day, and a therapist completed a Hand and Upper Extremity Splint Evaluation and Treatment Record, noting that Plaintiff could demonstrate correct splint use, would wear the splint as prescribed in order to regain hand strength and function, and that Plaintiff had some hearing loss and allergies.[12] TR 124-125.

Plaintiff visited Dr. Reed on September 21, 1999, with head congestion that drained down to her throat, a cough, and pressure in her ears. TR 220. Dr. Reed diagnosed allergies.[13] *Id.*

On February 11, 2000, Plaintiff saw Dr. Reed for head congestion, pressure in the ears, laryngitis, a cough, and chills that had started a few days before. TR 219. Dr. Reed diagnosed tinnitis and prescribed medications.[14] *Id.*

On April 12, 2000, Dr. Abbey reported that Plaintiff "cannot really wear her splints," and prescribed another kind of splint for her to try. TR 144. He noted that she did not want to change jobs, but Dr. Abbey suggested that she would have to make a decision if the splints were not successful. *Id.*

On May 3, 2000, Dr. Abbey reported that he had "no other option" but to place Plaintiff

_____

[12] The therapist's signature is illegible. TR 124.

[13] A second assessment and plans are illegible. TR 220.

[14] A second assessment and the names of the medications are illegible. TR 219.

on job restriction, because her hand was "extremely uncomfortable," both hands were "bothering her in and around her fingers," and "for all intents and purposes" she had intrinsic tendinitis. TR 143. Dr. Abbey prescribed pain medications to help her sleep. *Id.*

On May 24, 2000, Plaintiff returned to Dr. Abbey in "lots of discomfort," which he reported were the result of her doing a variety of jobs that involved the restricted movements of repetitive grasping, pulling, squeezing, lifting, and pushing. TR 142.

On June 8, 2000, Plaintiff again saw Dr. Reed, suffering from head congestion draining down her throat at night, a dry heaving cough, and puffy eyes that had started two days before. TR 219. Dr. Reed noted that she was not running a fever; he diagnosed allergies and prescribed Allegra 60.[15] *Id.*

On June 14, 2000, Dr. Abbey reported that Plaintiff's improvement since she had been taking time off work and modifying her activities was "dramatic" and "remarkable." TR 141. Dr. Abbey noted that this was "an excellent sign," but that Plaintiff's discomfort might return when she went back to work. *Id.*

On July 19, 2000, Dr. Abbey reported that Plaintiff was continuing to improve, and was "dramatically better" as a result of altering her work. TR 140. Because her company apparently did not have any work that fit the doctor's restrictions, however, he suggested that she go to vocational rehabilitation instead of returning to work. *Id.* On August 7, 2000, Dr. Abbey reported that he would allow her return to work with restrictions because she was making "gradual but steady" improvement. TR 139.

On September 5, 2000, Dr. Abbey reported that Plaintiff was continuing to make "slow

---

[15] Further plans are illegible. TR 219.

14

but steady progress," although he noted that she had hurt her wrist again while rolling pennies. TR 137.

On October 7, 2000, Dr. Gordon Doss evaluated Plaintiff to assess the level of her vocational disability following job-related injuries.[16] TR 58-63. After interviewing Plaintiff and reviewing her medical records and other documents in her file, and considering her age, education, and work history, Dr. Doss concluded that Plaintiff had a "significant vocational disability resulting from injuries to her hands and arms." TR 63. Dr. Doss noted that both "Dr. Abbey and Dr. Fishbein have described medical restrictions that would prevent [Plaintiff] from returning to any of the jobs she has performed in the past."[17] *Id.* Noting his assumption that "she would seek employment in the open labor market under normal hiring conditions," Dr. Doss opined that Plaintiff had "a vocational disability, or loss in earning capacity, of 55 to 60 percent." *Id.*

On October 10, 2000, Plaintiff went to Dr. Reed with head congestion, pressure in her face, and what felt like fluid in her ears. TR 218. Dr. Reed noted that she had no temperature, and he diagnosed allergies.[18] *Id.*

On October 30, 2000, Dr. Abbey reported that Plaintiff's progress had been so good that he was allowing her to return to her regular work, as she wished. TR 136. On November 20, 2000, Dr. Abbey noted that Plaintiff had been working for about a week and was "generally

---

[16] Although Dr. Doss' assessment is dated October 7, 2000, Dr. Doss writes in that assessment that he interviewed Plaintiff on December 8, 2000, and that his assessment is based upon that interview, review of Plaintiff's medical records and other documents in the file, and her age, education, and work history. TR 58.

[17] The Record before the Court does not contain any medical records from Dr. Fishbein.

[18] Dr. Reed's plans are illegible. TR 218.

15

doing OK." TR 135.

On January 8, 2001, Dr. Abbey reported that Plaintiff was still "really doing well" on her regular duty. TR 134.

On March 5, 2001, Dr. Abbey reported that he was "really encouraged" by Plaintiff's progress, although he noted that she still suffered some discomfort when doing repetitive grasping and drawing. TR 133.

Dr. Reed saw Plaintiff on March 13, 2001, for complaints that her head felt like it was "trying to stop up again" and that she had been suffering from a dry cough in the morning for the past week. TR 218. He diagnosed allergies and sinusitis.[19] *Id.*

On May 31, 2001, Plaintiff visited Dr. Reed, complaining that her left foot hurt, especially when she walked, and complaining of swelling that had started a "couple" of weeks earlier. TR 217. Dr. Reed noted Plaintiff's report that her "whole leg gave way" when she stepped on something.[20] *Id.*

On June 4, 2001, Dr. Abbey reported that Plaintiff was still "satisfactory," with only intermittent discomfort in her arms, and he released her from treatment. TR 132.

On July 5, 2001, Plaintiff went to the emergency department of the Trousdale Medical Center with a spider bite. TR 194-196. Dr. Houston A. Kelley prescribed Ibuprofen and told Plaintiff to apply ice. TR 196.

Dr. Reed saw Plaintiff on October 15, 2001, for low back pain. TR 217. He noted that

---

[19] Dr. Reed's plans are illegible. TR 218.

[20] Dr. Reed's assessment and plan are illegible. TR 217.

her gait was slow and unsteady, and he made an assessment of "DJD LS spine."[21]  *Id.*  Also on October 15, 2001, Plaintiff returned to the Trousdale Medical Center with an admitting diagnosis of "acute LS sprain."  TR 191-193.  Dr. Glenn F. Nabors, Jr., identified mild degenerative endplate changes, but he noted that the vertebral body heights were maintained, no subluxations were appreciated, and posterior elements were intact.  TR 193.

Plaintiff saw Dr. Reed on October 30, 2001, complaining that she had been experiencing lower right back pain and pain down the back of her leg for the previous fourteen days.  TR 216.  Dr. Reed assessed "DJD LS spine."  *Id.*  On October 31, 2001, Plaintiff was admitted to Trousdale Medical Center with the diagnosis of "DJD L5 spine."[22]  TR 189.

On November 7, 2001, Plaintiff returned to The Otology Group with complaints of progressive hearing loss.  TR 172, 175.  Dr. C. Gary Jackson diagnosed bilateral otosclerosis and noted that hearing aids would be appropriate for her.  TR 172.

On January 2, 2002, Plaintiff went to Dr. Reed with a cough and sore throat.[23]  TR 216.

On January 15, 2002, Plaintiff again went to Dr. Reed with a severe cough and congestion.  TR 215.  He reported that she had finished her medications but still was "not better."  *Id.*  Dr. Reed's assessment was asthmatic bronchitis.[24]  *Id.*

On January 25, 2002, Plaintiff again went to the Trousdale Medical Center emergency room with pain in the left side and was assessed by nurses K. Pierce, R.N., and K. Manui, R.N.,

---

[21] Another assessment and plans are illegible.  TR 217.

[22] The records do not indicate who treated Plaintiff or what tests were done.  TR 189-190.

[23] Dr. Reed's assessment and other notes are illegible.  TR 216.

[24] Dr. Reed's plan is illegible.

17

and physicians Bien Samson, M.D., and M.A. Todd, M.D. TR 182-188. Plaintiff reported that she experienced pain under her left arm when coughing, and rated the pain as a ten out of ten. TR 183. Plaintiff's pulse was regular and her respiratory system was clear, despite wheezing and coughing. *Id.* She was discharged in improved condition with prescriptions for Omnicef and Combivent. *Id.* Chest, PA, and lateral examinations revealed normal heart size, normal skeletal cage, and bronchial wall thickening, and Dr. Todd diagnosed bilateral bronchitis. TR 186. Laboratory testing did not reveal any irregularities. TR 187.

On January 30, 2002, Dr. Albert J. Gomez completed a Medical Assessment of Ability to do Work-Related Activities (Physical) form regarding Plaintiff. TR 199-203. Dr. Gomez indicated that Plaintiff retained the capacity to occasionally lift twenty to thirty pounds in an eight-hour workday and that she could stand or sit at least six hours in an eight-hour workday with normal breaks. TR 201. He found that she had chronic back pain, but had a full range of motion of the lumbosacral spine. *Id.* He also found degenerative joint disease, a history of carpal tunnel syndrome, decreased hearing in the left ear, and obesity. *Id.* He reported that Plaintiff's spine was normal, with no evidence of fracture, arthritis, or other osseous abnormality. TR 203.

Dr. James N. Moore completed a Physical Residual Functional Capacity Assessment ("RFC") regarding Plaintiff on March 1, 2002. TR 204-211. Based on evidence of Plaintiff's neck-shoulder rotation, fist strength, normal walking gait, normal back x-ray, clear lungs, and ability to converse despite hearing loss, he indicated that Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. TR

18

205-206. Dr. Moore further indicated that Plaintiff retained an unlimited capacity to push and/or pull. TR 205. He found no postural, manipulative, visual, communicative, or environmental limitations. TR 206-208.

On March 7, 2002, Plaintiff had her hearing tested by Shawn M. Lancaster at Ronald C. Sheffey Hearing Services.[25] TR 212.

On April 22, 2002, Plaintiff went to Dr. Reed, complaining of recurring right lower back pain; he diagnosed acute LS sprain.[26] TR 215.

On May 23, 2002, Plaintiff went to Dr. Reed with fluid in her ears. TR 214. He reported her statement that when she had gone to get hearing aids, she had been told to have her primary care physician check the fluid.[27] *Id.*

Plaintiff had her hearing tested at the Lifetime Hearing Clinic on July 11, 2002, by clinical audiologist Heather Hancock Dooley, M.A. TR 240. The results indicated "significant" worsening of the air thresholds AS, negative pressure AS, and conductive hearing loss AS. *Id.* Dr. Dooley recommended ENT evaluation. *Id.*

On July 29, 2002, Dr. Saul A. Juliao completed a Physical RFC Assessment regarding Plaintiff. TR 242-249. Dr. Juliao opined that Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. Dr. Juliao further indicated that Plaintiff retained an unlimited capacity to push and/or pull. TR 243. He indicated

---

[25] The record contains no explanation of the results of the test. TR 212.

[26] Further notes are illegible. TR 215.

[27] Further notes and prescriptions are illegible. TR 214.

19

that she could frequently climb, balance, stoop, kneel, crouch, and crawl. TR 244. He noted no manipulative or visual limitations. TR 245. He found that Plaintiff had limited hearing, but unlimited speaking ability. TR 246. He noted that Plaintiff should "avoid concentrated exposure" to noise, vibration, and fumes, odors, dusts, gases, poor ventilation, etc.; but that she could have unlimited exposure to extreme heat, extreme cold, wetness, humidity, and hazards such as machinery and heights. *Id*.

On May 12, 2004, Plaintiff received a Pulmonary Function Report from the Trousdale Medical Center.[28] TR 250-252. The report's Best Post-FVC interpretation was that Plaintiff suffered from moderate airway obstruction, low vital capacity, and possible superimposed chest restriction. TR 250.

On May 13, 2004, Dr. Reed completed a Medical Assessment of Ability to do Work-Related Activities (Physical) form regarding Plaintiff, basing his opinions on his examination of her. TR 253-255. Dr. Reed indicated that, because of her Chronic Obstructive Pulmonary Disease ("COPD") and Carpal Tunnel Syndrome ("CTS") in both hands, she could lift/carry ten pounds occasionally and five pounds frequently. TR 253. Because of her COPD, he opined that she could walk about fifty feet before becoming short of breath. *Id*. He did not comment on her ability to sit. TR 254. Dr. Reed indicated that Plaintiff should never climb or balance, but could occasionally stoop, crouch, kneel, and crawl. *Id*. He further opined that she could never reach, handle, feel, push/pull, or hear. *Id*. He imposed the environmental limitations of heights, moving machinery, temperature extremes, chemicals, dust, fumes, humidity, and vibration. *Id*. Dr. Reed opined that Plaintiff was too limited regarding her hands, hearing, and breathing, to be

---

[28] The record does not indicate who performed the tests. TR 250-252.

20

capable of gainful employment.  TR 255.

## B.  Plaintiff's Testimony

Plaintiff was born on September 14, 1957, and had a seventh grade education.  TR 263.

Plaintiff testified that she had last worked in the Tool Pressure factory, which manufactured stove and grill racks.  TR 264.  Plaintiff said she did "anything and everything," dropping a big wire into a bender, shaking a machine that put wire across the frame, writing out tickets, running the crimper machine, welding brace wires, loading parts in the basement, working on the paint line, inspecting, or doing other work.  TR 264-265.  Plaintiff stated that she had worked there nearly five years, but had stopped when the plant closed in July 2001.  TR 265-266.  She further testified that she had tried to get a new job at Toshiba, but when her CTS was discovered, "they said no."  TR 266-267.

Plaintiff testified that she had filed a Workers' Compensation claim in 1997 for the bilateral CTS she sustained while working at Phil Krutcher Wire.  TR 267-268.  She reported having "had a lot of trouble" when she went back to work after her surgery.  *Id.*  Plaintiff stated that she was right-handed, and that her right hand gave her the most trouble.  *Id.*  She reported that, even though she had pain and difficulty gripping, "they wouldn't understand that [she] had to take a break."  TR 269.  She said that she had continued to work there, however, "until the day they shut the doors up there."  *Id.*

Plaintiff stated that she had seen Dr. Abbey, Dr. Reed, and Dr. Hazlewood about her hands.  TR 269.  She testified that she had undergone physical therapy, but that she continued to have trouble because her hands "stay swelled."  TR 269-270.

Plaintiff guessed that the heaviest thing she had had to lift at Phil Krutcher was about

fifteen pounds on average, and she testified that she had had to lift things frequently. TR 270. Plaintiff testified that she had moved to Phil Krutcher after her previous factory, Lambstill, had gone out of business. TR 270-271. She reported that, at Lambstill, she had bolted and banded legs on sewing machine tables, done flap and assembly in the wood department, and drilled holes in table tops, all tasks that required using her hands. TR 271. She stated that she had worked there for over a year, and that prior to Lambstill, she had worked at Sportswear as a custodian. TR 271-272. She said that she had mopped, swept, dusted, cleaned bathrooms, and emptied containers. TR 272. She testified that she had "moved up" into floor work, cutting sleeves, stacking them, inspecting, marking sleeves, and using scissors. TR 272-273. She testified that, prior to working at Sportswear, she had worked at another sewing factory that went out of business. TR 273. There, she had worked in the cutting department, using scissors and using her hands. TR 274. Plaintiff also stated that she had worked for at least a year at Lee Alco, which made storm doors and windows. *Id.* Plaintiff said that her job there had been to put glass into window frames and to do anything on the door line. TR 275.

Plaintiff testified that she had used her hands in all the jobs that she had held. TR 275. She further stated that, although she had gotten hearing aids, which helped her hearing loss, she had been unable to get them fixed since her husband was the household's only source of income. TR 276. She reported that she sometimes lost her balance. TR 277.

Her attorney then asked Plaintiff about her breathing problems. TR 278. Plaintiff stated that Dr. Reed had treated the problem with Advair Discs, an inhaler, and a breathing machine that she used three times a day or more. *Id.*

Her attorney next questioned Plaintiff about the pain in her hands. TR 278. Plaintiff

22

stated that her hands hurt, swelled up, and throbbed up to the elbow. TR 278-279. She reported

that she tried not to take medications for her hands because she was already "on so much now,

it's awful." TR 279. She stated that she took aspirin, Motrin, "and things like that" for pain, but

avoided "heavy-duty drugs." *Id.* Plaintiff further testified that when the weather changed, her

hands throbbed, which she treated by putting them in cold water. *Id.* Plaintiff noted that the

weather also affected her shortness of breath. TR 280.

     Plaintiff reported that she had asthma and that it made her wheeze "real bad." TR 280.

She said that she got out of breath walking and climbing stairs, but that elevators made her dizzy.

*Id.* She stated that dust and fumes made her cough, that gases, heat, and humidity took her

breath away, and that she took allergy pills to help with pollen. TR 280-281.

     Her attorney then asked Plaintiff what was wrong with her back. TR 281. Plaintiff

answered that she had once pulled a muscle at Phil Krutcher, which had kept her in bed two

weeks or more. TR 282. She added that after she went back to work, the pain had improved but

would "just kind of go in and out." *Id.* She testified that standing up for long periods of time

would put pressure on her back and that her breathing had "a lot to do with it." *Id.*

     Plaintiff reported that she had trouble writing, pushing, pulling, opening a jar, and

picking up small objects. TR 282. She said that she would "occasionally break things" when

her hands were swollen. *Id.* She reported doing "some" housework, including sweeping,

vacuuming, grocery shopping, and cooking. TR 283.

     Plaintiff testified that she spent "a lot" of her time inside and that she had to have air

conditioning. TR 283. She testified that she could no longer do her hobbies, embroidery and

drawing, because of her hand problems. TR 284. She said that the only thing she could do was

watch television.  *Id.*  She reported talking to her sisters on the phone "some."  TR 285.

Plaintiff reported that her breathing condition was the disability that held her back the most.  TR 285.  The ALJ asked Plaintiff how long she had suffered from her breathing condition, and she answered that she did not remember, but that she knew it had been two years.  *Id.*

Plaintiff reaffirmed that she was right-handed and that her right hand was in the most pain.  TR 285.  She reported that she was able to do housework "so-so" and to use her hands for personal care, although she said that sometimes her husband helped her comb her hair.  TR 286.  She said that she could not use her hands to do things repetitively or continuously.  *Id.*

The ALJ then asked Plaintiff about her hearing aids, and she repeated that they were "messed up."  TR 286.

The ALJ asked Plaintiff whether she remembered hurting her back, and she again mentioned pulling a muscle while working for Phil Krutcher.  TR 287.

The ALJ next asked Plaintiff how many weeks of unemployment benefits she had received, and she said that she would guess a couple of months.  TR 287.

### C.  Vocational Testimony

Vocational Expert ("VE"), Dr. Kenneth Anchor, also testified at Plaintiff's hearing.  TR 288.  With regard to Plaintiff's past relevant work history, the VE classified Plaintiff's job as a machine operator as medium, unskilled; her job as a press operator as medium, semi-skilled; her job as a janitor as medium, semi-skilled; her job as a factory worker as light, unskilled; and her job as a garment inspector as light, semi-skilled.  *Id.*  The VE stated that Plaintiff did not have any transferable skills from any of these jobs.  TR 289.  The VE further stated that his classifications were consistent with the DOT.  *Id.*

24

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff and asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. TR 289-290. Specifically, the ALJ described a person with a limited education, hearing loss, difficulty with conversations, ability to lift twenty to thirty pounds, ability to stand and walk for six hours, and ability to sit for six hours. *Id.* The VE answered that the hypothetical claimant would be able to perform Plaintiff's past light jobs, but would be limited to jobs at the sedentary or light level. TR 290.

The ALJ then posited the DES assessments, the most restrictive of which limited lifting to fifty pounds occasionally and twenty-five pounds frequently, standing and walking to six hours, and sitting to six hours; imposed some environmental restrictions on hearing conservation measures, vibration, and avoiding concentrated exposure to airborne irritants; and considered hearing limitations. TR 290. The VE stated that such an individual could perform a range of jobs at the medium, light, and sedentary levels, and that Plaintiff's past relevant work as garment inspector and machine operator would be least affected by such limitations. *Id.*

The ALJ then asked the VE to consider a right-handed person with bilateral upper extremity limitations, the right greater than the left, such that the individual had to avoid repetitive or continuous hand motion activity, gripping, and grasping. TR 291. The VE stated that of Plaintiff's past relevant work, the garment inspector job would be least affected by such limitations, but the other work would be affected. *Id.*

The ALJ next described an individual with limitations like Plaintiff's most recent assessment, which limited lifting to ten pounds occasionally and five pounds frequently, limited standing and walking, required an at-will change of position alternative, ruled out climbing and

balancing, and allowed occasional stooping, crouching, kneeling, and crawling. TR 291. He asked the VE to assume that the individual had to "avoid competitive or continuous activity," and that environmental restrictions included exposure to heights, moving machinery, temperature extremes, airborne irritants, extremes of temperature, humidity, and vibration. *Id.* The VE stated that such limitations would rule out all past work, and that he could not identify work for such a person, although a limited range of sedentary jobs would meet the criteria. TR 292.

Finally, the ALJ asked the VE to describe the effect on work of pain that affects functioning. TR 292. The VE responded that mild to moderate pain would not be a significant impediment to gainful activity, but that chronic, intractable, severe, persistent, unremitting, overwhelming pain unresponsive to medication or other forms of treatment would prevent full-time work in a conventional job setting. *Id.*

### III.  CONCLUSIONS OF LAW

### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."

*Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner, however, did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy

27

in significant numbers regardless of whether such work exists in the immediate area in which

Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he

or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step

sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[29] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> (5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175,

1181 (6th Cir. 1990).

---

[29]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

## C.  Plaintiff's Statement Of Errors

Plaintiff generally contends that the ALJ's disability determination was not supported by substantial evidence. Docket Entry No. 6. Specifically, Plaintiff contends that the ALJ (1) erred in finding that she retained an RFC for medium work and that she could return to her past relevant work as a garment inspector; (2) failed to accord proper weight to the opinion of her treating physician; (3) erred in finding that her subjective claims about her limitations were not fully credible; and (4) erred in not considering her Workers' Compensation settlement. *Id.* Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's

decision should be reversed with an immediate award of benefits, or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

**1. Substantial Evidence**

Plaintiff generally maintains that the ALJ's disability determination was not supported by substantial evidence. Docket Entry No. 1.

As explained above, "substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion," *Her*, 203 F.3d at 389 (*citing Richardson*, 402 U.S. at 401), and has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell,* 105 F.3d at 245 (*citing Consolidated Edison Co.,* 305 U.S. at 229).

As will be discussed in greater detail below, the record in the case at bar is replete with

30

doctors' evaluations, medical assessments, and test results that were properly considered by the ALJ, and that constitute substantial evidence on which he based his decision. The ALJ's articulated rationale demonstrates that he considered the record as a whole, evaluating all of the objective medical and testimonial evidence. While it is true that some of the testimony and evidence supports Plaintiff's allegations of disability, it is also true that much of the evidence supports the ALJ's disability determination. TR 17-18.

As has been noted, the reviewing court does not substitute its findings for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner*, 745 F.2d at 387. In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key*, 109 F.3d at 273). The ALJ's decision was properly supported by "substantial evidence;" the ALJ's decision, therefore, must stand.

## 2. Residual Functional Capacity

Plaintiff specifically maintains that the ALJ erred in finding that Plaintiff retained an RFC for medium work and that she could therefore return to her past relevant work as a garment inspector. Docket Entry No. 6.

"Residual Functional Capacity" is defined as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c). With regard to the evaluation of physical abilities in determining a claimant's Residual Functional Capacity, the Regulations state:

> When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical

31

demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

20 C.F.R. § 404.1545(b).

After discussing the medical and testimonial evidence of Record at length, the ALJ in the case at bar determined:

> Accordingly, the record supports the conclusion that the claimant retains the residual functional capacity for medium work activity, as follows: The claimant is able to lift 50 pounds occasionally and 25 pounds frequently. She can stand/walk for six hours, and sit for six hours in an eight hour workday. She is unable to use the hands for repetitive gripping, grasping, or wrist movements. The claimant is limited in her ability to hear. She should avoid concentrated exposure to noise, vibration, fumes, odors, dusts, gases, and poor ventilation.

TR 17.

As has been noted, in reaching his conclusion, the ALJ discussed the medical records and testimony at length. TR 14-17. The ALJ's articulated rationale demonstrates that he did not rely solely on one doctor's opinion, but considered the record as a whole, evaluating all of the medical evidence and Plaintiff's own testimony at the hearing, in determining that Plaintiff retained the Residual Functional Capacity to perform medium work. TR 17. The ALJ's determination was supported by substantial evidence; his determination, therefore, must stand.

Plaintiff argues that her inability to use her hands for repetitive, gripping, grasping, or wrist movements is inconsistent with the VE's testimony that she could perform her past relevant work as a garment inspector. Docket Entry No. 6. The ALJ may properly rely on a VE's

testimony, however, if the hypothetical question posed by the ALJ accurately represents the claimant's limitations. *See Varley*, 820 F.2d at 779 (*quoting O'Banner v. Secretary*, 587 F.2d 321, 323 (6th Cir. 1978)). The ALJ's hypothetical question posed to the VE in the case at bar incorporated both Plaintiff's exertional and nonexertional limitations. *See* TR 289-291.

Because the ALJ's hypothetical question accurately represented Plaintiff's limitations that he found credible, the ALJ properly relied on the VE's answer that Plaintiff could perform her past relevant work as a garment inspector. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary*, 823 F.2d 922, 927-928 (6th Cir. 1987); and *Varley*, 820 F.2d at 779. Since Plaintiff could return to her past relevant work as a garment inspector, the ALJ properly ceased his inquiry and found that Plaintiff was "not disabled" under the requirements of the Act. Accordingly, Plaintiff's argument fails.

**3. Weight Accorded to the Opinion of Plaintiff's Treating Physician**

Plaintiff also specifically contends that the ALJ did not accord proper weight to the opinion of Dr. Reed, Plaintiff's treating physician. Docket Entry No. 6.

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more

weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...

(3) Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...

(4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

20 C.F.R. § 416.927(d) (emphasis added).  *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  The Code of Federal Regulations defines a "treating source" as:

[Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

34

20 C.F.R. § 404.1502.

Dr. Reed treated Plaintiff for an extensive period of time, a fact that would justify the ALJ's giving greater weight to his opinion than to other opinions. As the Regulations state, however, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2). Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above, and the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 C.F.R. § 416.927(e)(2).

The ALJ, in his decision, detailed the findings contained in Dr. Reed's May 13, 2004, Medical Source Statement of Ability to do Work-Related Activities (Physical) form. TR 16. The ALJ also acknowledged that Dr. Reed's opinion, as Plaintiff's treating physician, was "entitled to special significance." TR 17. Upon comparing the restrictions Dr. Reed placed on Plaintiff with the restrictions indicated by other physicians, x-rays, audiological evaluations, and pulmonary function testing, the ALJ determined that the record did not support Dr. Reed's limitations and declined to accord Dr. Reed's opinion controlling weight. TR 15-17. The ALJ noted that Plaintiff's May 12, 2004, pulmonary function studies indicated that she had "mild chest restriction, and moderate airway obstruction." TR 17. The ALJ further noted that, although Dr. Reed had restricted Plaintiff's abilities based on carpal tunnel syndrome and COPD, Dr. Gomez found no restrictions in Plaintiff's hands or upper extremities. *Id.* The ALJ discussed Plaintiff's own hearing testimony in determining that her "ability to use her hands and arms appears improved since 2002." *Id.*

35

Because Dr. Reed's opinion contradicts other evidence of record, the Regulations do not mandate that the ALJ accord Dr. Reed's evaluation controlling weight. Accordingly, Plaintiff's argument fails.

## 4. Credibility and Subjective Complaints

Plaintiff argues that the ALJ erroneously found that her allegations regarding her limitations were not fully credible. Docket Entry No. 6.

In finding that Plaintiff's "allegations regarding her limitations are not totally credible," the ALJ explained that, although Plaintiff testified to suffering from bilateral carpal tunnel syndrome, impaired hearing, problems with balance, difficulty breathing, finger pain, difficulty picking up small objects, shortness of breath caused by weather, dust, and fumes, and back pain that was exacerbated with walking, pushing, and pulling, she also testified that she was able to sweep, dust, shop for groceries, and watch television. TR 16-17. The ALJ also noted that, although Plaintiff reported in May 2002, an inability to do daily activities, use her hands or arms, or care for her personal needs, Plaintiff's testimony at the hearing indicated that her ability to use her hands and arms had improved since that time. TR 17. The ALJ further noted that, despite Plaintiff's complaints of back pain and shortness of breath, x-rays of her back were normal and pulmonary function testing revealed only "mild chest restriction" and "moderate airway obstruction." *Id.*

The ALJ's decision addresses not only the medical evidence, but also Plaintiff's testimony and her subjective claims, clearly indicating that these factors were considered. TR 15-17. Although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on medical findings that were inconsistent with Plaintiff's allegations. This is within the ALJ's

36

province.

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987)). If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record (*see King*, 742 F.2d at 975).

After considering the medical and testimonial evidence discussed above, the ALJ determined that Plaintiff's "allegations regarding her limitations [were] not totally credible." TR 18. As has been noted, this determination is within the ALJ's province.

The ALJ observed Plaintiff during her hearing, assessed the medical records, and reached a reasoned decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper. Therefore, this claim fails.

37

## 5. Consideration of Workers' Compensation Settlement

Plaintiff maintains that, although the ALJ is not bound by the findings of the state Workers' Compensation judge, the ALJ "arguably" should have considered the Workers' Compensation settlement that Plaintiff received when evaluating the evidence and reaching his disability determination. Docket Entry No. 6.

As Plaintiff correctly acknowledges, the ALJ in the case at bar is not bound by the findings of the Workers' Compensation judge. The Code of Federal Regulations specifically states:

> A decision by any nongovernmental agency or any other nongovernmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us.

20 C.F.R. § 404.1504.

Plaintiff was awarded Workers' Compensation benefits in the 1980s, yet she continued to work full-time until 2001. TR 59. Significantly, Plaintiff's August 27, 2002, Workers' Compensation settlement Order notes:

> The Plaintiff was treated by Dr. Paul Abbey who opined that she would retain *no permanent partial impairment* as a result of her injuries of February 15, 1997. The plaintiff was also seen by Dr. Richard E. Fishbein who opined that she retains a *nine percent* (9%) permanent impairment to the right upper extremity and a *seven percent* (7%) permanent impairment to the left upper extremity as a result of her injuries.

TR 50-51 (emphasis added).

Neither Dr. Abbey's nor Dr. Fishbein's assessment renders Plaintiff disabled within the meaning of the Act. Additionally, Plaintiff collected unemployment benefits from July 1, 2001, through at least May 2002, indicating that she was willing and able to perform gainful work activity. TR 260-262.

Because the Regulations expressly preclude findings by other agencies from having a binding effect on Social Security decisions and require that the claimant's "physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings" (20 C.F.R. §§ 404.1504, 404.1508), and because the ALJ's determination that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations was supported by substantial evidence, Plaintiff's contention fails.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgement on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

39

_____
E. CLIFTON KNOWLES
United States Magistrate Judge

40